J-S22001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: S.D.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 37 WDA 2024 |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s):  017 of 2023

| | | |
|---|---|---|
| IN RE:  ADOPTION OF:  M.D.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 38 WDA 2024 |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s):  018 of 2023

| | | |
|---|---|---|
| ADOPTION OF:  B.S.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF:  J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 39 WDA 2024 |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 064 of 2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T.D.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 40 WDA 2024 |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): No. 020 of 2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.J.-M. S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J. C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 41 WDA 2024 |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): No. 019 of 2023

BEFORE: PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.: **FILED: SEPTEMBER 24, 2024**

J.C. ("Mother") appeals from the December 13, 2023 orders involuntarily terminating her parental rights to her five biological sons, T.D.S., born in January 2011; M.J.-M.S., born in December 2012; M.D.S., born in November 2013; S.D.S., born in March 2020; and B.S.S., born in June 2021,

- 2 -

(collectively, "the Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1] In addition, Mother's appointed counsel, Tyler Schultz, Esquire ("Counsel"), has filed a petition to withdraw and an accompanying brief, pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). After review, we grant Counsel's petition to withdraw and affirm the December 13, 2023 orders.

Our review of the certified record indicates that, in January 2021, due to concerns of "incorrigibility and truancy" related to the three oldest children, as well as allegations of Mother's substance abuse, the Westmoreland County Children's Bureau ("the Agency") provided Mother with services, including drug and alcohol screening and counseling. **See** N.T., 11/16/23, at 5-6; Agency Exhibit 12. In April 2021, prior to B.S.S.'s birth, the Children's maternal aunt, M.C. ("Maternal Aunt"), privately obtained custody of the four oldest children when Mother entered inpatient treatment for substance abuse. Thereafter, as Maternal Aunt needed financial assistance, the court placed the

_____

[1] The court involuntarily terminated the parental rights of H.L.S., IV, the father of M.D.S., T.S.S., and M.J.-M.S., pursuant to the same orders. H.L.S., IV, likewise appealed, and we address his appeals by separate memorandum at Superior Court Docket Nos. 108-110 WDA 2024.

The court additionally involuntarily terminated the parental rights of S.W., the putative father of S.D.S., as well as those any unknown father, and J.A.M., the father of B.S.S. Neither S.W., J.A.M., nor any unknown father, appealed or participated in the instant appeals.

Children in the legal and physical custody of the Agency on July 23, 2021, and they remained in kinship care with Maternal Aunt. The court adjudicated the Children dependent on August 23, 2021.[2] **See** N.T., 11/16/23, at 4-5, 30, 81-82; Agency Exhibit 12.

The court established an initial permanency goal of return to parent or guardian.[3] In furtherance of reunification, Mother was ordered to submit to a drug and alcohol evaluation and comply with the recommendations; submit to random drug screens; undergo a parenting assessment and follow the recommendations; and obtain/maintain a stable and appropriate household. **See** Agency Exhibit 12. Throughout the ensuing dependency proceedings, Mother was additionally ordered to complete mental health treatment and take any medication as prescribed; to complete offender's treatment; to obtain a verifiable and legal source of income; and to participate in services while incarcerated. **See id.**

Mother successfully completed drug and alcohol treatment. However, following her return to Westmoreland County in January 2022, she relapsed and was homeless. **See** N.T., 11/16/23, at 5, 7-8; **see also** Agency Exhibit

---

[2] H.L.S., IV, was incarcerated at the time of his children's adjudication. **See** N.T., 11/16/23, at 5, 21, 67-68, 71; **see also** Agency Exhibit 12. S.W., the putative father of S.D.S., never responded to outreach from the Agency. **See** N.T., 6/29/23, 112-17.

[3] The court established a concurrent permanency goal of adoption on November 1, 2021. **See** Agency Exhibit 12.

12. Subsequent to completion of another evaluation in March 2022, Mother failed to complete the recommended further treatment and was unsuccessfully discharged in May 2022. *See* N.T., 11/16/23, at 7-8; **see also** Agency Exhibit 12. Additionally, Mother tested positive for, *inter alia*, methamphetamines and/or amphetamines on approximately seven occasions from February through May 2022. *See* N.T., 6/29/23, at 28-30, 45-46; **see also** N.T., 11/16/23, at 8; Agency Exhibit 2.

On May 10, 2022, the Agency obtained emergency custody of B.S.S., to whom Mother gave birth during inpatient treatment, due to reports of neglect and substance abuse. *See* N.T., 11/16/23, at 4-5, 32; **see also** Agency Exhibit 12. Significantly, Mother essentially left B.S.S. strapped in his car seat and exposed to drugs. *See* N.T., 11/2/23, at 41-42, 185-87; N.T., 11/16/23, at 78. Hair follicle testing of B.S.S. conducted subsequent to his removal and placement yielded positive results for amphetamines and methamphetamines. *See* Orphans' Court Opinion (B.S.S.), 12/13/23, at 4; **see also** N.T., 6/29/23, at 175-77; N.T., 11/2/23, at 41. He was found to be severely malnourished and ultimately diagnosed with failure to thrive. *See* N.T., 11/16/23, at 41-42.

The court adjudicated B.S.S. dependent on May 27, 2022, and established a permanency goal of return to parent or guardian and a

concurrent goal of adoption.[4] B.S.S. was placed in a separate kinship foster home from his siblings, where he remained at the time of the subject proceedings. *See* N.T., 11/16/23, 4, 40; Agency Exhibit 12.

Moreover, while Mother was afforded supervised visitation, both in-person and virtual, her participation, while initially robust, became infrequent until the court then suspended all contact between Mother and the Children in May 2022, pending resolution of outstanding Child Protective Services ("CPS") reports and a parenting assessment.[5] *See* Agency Exhibit 12; see also N.T., 11/2/23, at 57, 166-69, 179-182; N.T., 11/16/23, at 10-12, 74. Specifically, "[t]he [three oldest] children [] disclosed sexual abuse, mental injury, related to the fact that there was drug use while they lived with [M]other, that they lacked food while they lived with [M]other, and that there was physical abuse while they were with [M]other." Agency Exhibit 12, Recommendation-Permanency Review, 5/10/22, at 2. These disclosures resulted in seven CPS reports that were outstanding at the time and were ultimately indicated. *See id.*; *see also* N.T., 11/16/23, at 49. As a result, the court found contact with Mother to be a "grave risk of harm," based on testimony from the Children's

---

[4] B.S.S.'s father remained incarcerated throughout the time of the subject hearings. *See* N.T., 11/16/23, at 5, 16; *see also* Agency Exhibit 12.

[5] As best we can discern, the court did not suspend Mother's contact with B.S.S. until December 2022. *See* Agency Exhibit 12. Notwithstanding, her confirmation of and participation in visitation with him was limited. *See* N.T., 11/2/23, at 180, 182-83; N.T., 11/16/23, at 12.

providers. *See* Agency Exhibit 12; *see also* N.T., 11/16/23, at 10-12. This "no contact" order remained in effect at the conclusion of the subject proceeding, approximately a year and a half later. *See* Agency Exhibit 12; *see also* N.T., 11/16/23, at 11, 49.

Specifically, the Agency discovered that Mother had operated a meth lab out of the basement, exposing the Children to a web of drugs and alcohol, sex, weapons, violence, and unknown people. They were subject to physical discipline, sexual abuse, and instability. Their health, hygiene, and education were neglected. They had access to limited food and had to cook and care for themselves. Meanwhile, they had to also attempt to care for and comfort S.D.S., who was a baby and left in his crib. *See* N.T., 6/29/23, 61-63, 68, 72-73, 91, 125-31; N.T., 11/2/23, at 35-41, 43, 53, 59, 126-27.

Given the resulting complex developmental trauma[6] as a result of this experience, the Children exhibited behavioral problems, including aggression, tantrums, and issues with urination and defecation, and/or developmental delays and were all engaged in ongoing trauma therapy. *See* N.T., 6/29/23, at 58, 60-61, 65-66, 68, 71; N.T., 11/2/24, at 6-8, 32, 35-43, 45, 124-26, 129-34. Notably, the three oldest children were all diagnosed with, *inter alia*, post-traumatic stress disorder ("PTSD") and were treated with medication. *See* N.T., 11/2/23, at 6, 8, 45-46, 49, 134; N.T., 11/16/23, at 32, 42. In

---

[6] This was defined as trauma that occurs in "developmentally significant times, like childhood." N.T., 11/2/23, at 45, 84.

addition, T.D.S. had even been hospitalized on several occasions for mental health reasons. *See* N.T., 11/2/23, at 46, 57.

At regular permanency review hearings conducted from May 2022 through December 2022, Mother's compliance and progress were characterized as none to minimal. *See* N.T., 11/16/23, at 24-26; *see also* Agency Exhibit 12.

On February 1, 2023, the Agency filed petitions to involuntarily terminate Mother's parental rights to the four older children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Subsequently on June 27, 2023, the Agency filed a petition to involuntarily terminate Mother's parental rights to the youngest child, B.S.S., pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The court held evidentiary hearings on the Agency's petitions on June 29, 2023, November 2, 2023, and November 16, 2023.[7] Over the course of the three hearings, the Agency presented the testimony of its caseworker, as well as numerous service providers. Specifically, the Agency presented the testimony of the following witnesses: Jean DeFilippis, of ARC Point Labs, who performed drug testing services; Dr. Neil Rosenblum, clinical psychologist, of Allegheny Forensic Associates, who conducted mental health evaluations of

---

[7] The Children were represented by a separate guardian *ad litem* ("GAL") and legal counsel, both of whom argued for termination of Mother's parental rights at the conclusion of the subject proceedings. *See* 23 Pa.C.S.A. § 2313(a); *see also* N.T., 11/16/23, at 91, 99-100. Neither filed briefs with this Court related to the instant appeals.

the three oldest children and was stipulated as an expert in mental health evaluations; Richelle O'Malley, of In-Clusion, who conducted a parenting assessment of Mother; Nicole LaValle, school-based therapist, of Excela Health, who provided outpatient individual therapy to the three older children; Dr. Christine Mahady, certified attachment and trauma-focused clinician, who conducted assessments of the Children and provides individual and family therapy and was stipulated as an expert witness in trauma therapy and assessments; Ashley McKoy, certified trauma and attachment clinician, who provides individual therapy and was stipulated as an expert in the field of trauma therapy and therapeutic play; Thomas Sibel, family resource specialist, of JusticeWorks; and Amber Wannamaker, Agency caseworker.[8] Mother, who was represented by counsel but only appeared for the first hearing date,[9] did not testify or offer any evidence.

By orders dated December 13, 2023, the orphans' court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A.

_____

[8] The Agency additionally presented the testimony of two providers related to the Children's fathers.

[9] Mother was incarcerated at the time of the June 29, 2023 hearing, having been imprisoned since April 2023. **See** Agency Exhibit 12. As best we can discern, she was released prior to the November 2023 hearings. Counsel was able to reach Mother via telephone at the beginning of the hearing on November 2, 2023. Despite indicating that she was on her way to court, Mother never appeared. **See** N.T., 11/2/23, at 30, 46; **see also** N.T., 11/16/23, at 13-14.

§ 2511(a)(2), (5), (8), and (b). The court filed contemporaneous opinions setting forth its rationale. On December 21, 2023, Mother filed timely notices of appeal.[10] On the same date, Counsel filed what we deem to be a statement of the intent to withdraw in lieu of filing a statement pursuant to Pa.R.A.P. 1925(c)(4). The court filed responsive Rule 1925(a) opinions on December 28, 2023, wherein it referred this Court to its prior filings.

Thereafter, Counsel filed a petition to withdraw, as well as an *Anders* brief.[11] By memorandum filed on August 26, 2024, this Court denied Counsel's petition to withdraw and directed Counsel to file an amended *Anders* brief, along with a new petition to withdraw within 14 days. Counsel timely complied on August 28, 2024.

When counsel seeks to withdraw pursuant to *Anders* and its progeny, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw. *See In re Adoption of M.C.F.*, 230 A.3d 1217, 1219 (Pa. Super. 2020) (quoting *Commonwealth v. Daniels*, 999 A.2d 590, 593 (Pa. Super. 2010)) ("'When presented with an *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (cleaned up).

---

[10] This Court consolidated Mother's appeals *sua sponte* on January 31, 2024.

[11] This Court extended the *Anders* procedure to appeals from decrees terminating parental rights involuntarily in *In re V.E.*, 611 A.2d 1267, 1275 (Pa. Super. 1992).

To procedurally withdraw, counsel must:

1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [**Anders**] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

**Commonwealth v. Cartrette**, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted). Counsel must also "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, our Supreme Court has set forth the following requirements for **Anders** briefs:

[W]e hold that in the **Anders** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361. **Anders** and **Santiago** require substantial, not perfect performance. **See Commonwealth v. Wrecks**, 934 A.2d 1287, 1290 (Pa. Super. 2007); **see also Commonwealth v. Redmond**, 273 A.3d 1247, 1252 (Pa. Super. 2022).

Instantly, in his petition to withdraw, Counsel certified that he made a conscientious review of the record and determined that Mother's appeals are

frivolous. He further attached copies of a *Millisock* letter informing Mother of her rights. Likewise, Counsel's amended *Anders* brief substantially complies with the requirements set forth in *Santiago*, *supra*.[12]

Having concluded that Counsel complied with the procedural requirements of *Anders*/*Santiago*, we must next "conduct a review of the record to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated." *Commonwealth v. Yorgey*, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

Counsel's *Anders* brief raises the following issues for our review:

I. Did the [orphans' c]ourt err when it terminated the parental rights of [Mother] pursuant to The Adoption Act and specifically 23 Pa.C.S.[A.] § 2511 (a)(2)?

II. Did the [orphans' c]ourt err when it terminated the parental rights of [Mother] pursuant to The Adoption Act and specifically 23 Pa.C.S.[A.] § 2511(a)(5)?

III. Did the [orphans' c]ourt err when it terminated the parental rights of [Mother] pursuant to The Adoption Act and specifically 23 Pa.C.S.[A.] § 251 1(a)(8)?

V. Did the [orphans' c]ourt err when it terminated the parental rights of [Mother] pursuant to The Adoption Act and specifically 23 Pa.C.S.[A.] § 2511(b)?

*Anders* Brief at 8-9 (suggested answers omitted).

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the

_____

[12] Mother has not responded to Counsel's petition to withdraw and *Anders* brief.

decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. ***See*** 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses

upon the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence. *See In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see also Interest of M.E.*, 283 A.3d at 830.

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(2), (5), (8), and (b). To affirm the underlying decrees, however, we need only agree with the court's decision as to any one subsection of Section 2511(a), along with Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As such, we will focus our discussion on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

- 14 -

> With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of subsection (a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied. *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Section 2511(a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties. . . . **This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it**." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (cleaned up) (emphasis in original). Section 2511(a)(2) grounds are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by Interest of K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023). We have long recognized that "[p]arent are required to make

diligent efforts towards the reasonably prompt assumption of full parental duties." **A.H.**, 247 A.3d at 443.

In concluding that termination of Mother's parental rights was warranted under Section 2511(a)(2), the orphans' court considered Mother's failure to make progress toward reunification and remedy the reasons for the Children's removal. The court stated, in relevant part:

> Mother has not taken sufficient corrective action to alleviate the concerns of the [A]gency. . . . [M]other continues to struggle with substance abuse issues. Mother, despite utilizing the services provided, continued to test positive for illegal substances and due to a lack of staying clean, had been discharged from services. Mother has failed to submit to any random drug screens in months, therefore; her use of illegal substances remains in question. Additionally, [M]other was never able to secure a verifiable and legal source of income. Mother, despite having been provided with services to secure stable and appropriate housing, never followed this court['s] directive. Further, [M]other never completed her offender's treatment or her parenting. Visits between [M]other and the [Children] were never resumed due to concerns [for continued trauma to the Children]. Mother continues to demonstrate a lack of willingness to cooperate with the [Agency]. Mother hasn't taken any recent steps to indicate . . . her capabilities to provide the [Children] with essential parental care, control, or subsistence that would be necessary to provide for [the Children's] physical or mental well-being. Further, [M]other has not remedied the reasons leading to [the Children's] removal nor has there been any recent progress which would elicit a desire for the issues to be remedied in the near future.

Orphans' Court Opinion, 12/13/23, at 8-9 (unpaginated).[13]

_____

[13] For purposes of this memorandum, we refer to the opinions submitted contemporaneously with the subject termination orders as "Orphans' Court Opinion." While the court filed separate opinions at each lower court docket number, as they are substantially similar, we cite generically and without differentiation.

A review of the record supports the termination of Mother's parental rights under Section 2511(a)(2). The record unequivocally reveals and definitively establishes that the Children suffered abuse and neglect while in the care of Mother.

Specifically, "[t]he [C]hildren [] disclosed sexual abuse, mental injury, related to the fact that there was drug use while they lived with [M]other, that they lacked food while they lived with [M]other, and that there was physical abuse while they were with [M]other." Agency Exhibit 12, Recommendation-Permanency Review, 5/10/22, at 2. These reports were indicated by the Agency. *See* N.T., 11/16/23, at 49.

Dr. Rosenblum, who was tasked with conducting mental health evaluations of the three oldest children and determining whether they suffered emotional abuse or serious mental injury as a result of the reported maltreatment of Mother, opined, "[T]he boys showed behavior[al] concerns and a history consistent with both emotional abuse and serious mental injury as defined by the Commonwealth of Pennsylvania for child neglect." N.T., 6/29/23, at 78. He further elaborated as follows:

> **After completing these evaluations there is significant evidence and documentation to confirm that all three boys were exposed to ongoing emotional abuse, serious mental injury and child neglect while in the care of [M]other.** All three boys spoke of being exposed to ongoing drug use by [M]other over an extended period of time. The boys were aware of where [M]other stored the drugs and possibly prepared drugs in her basement. It was also mentioned the boys may well have delivered packages containing drugs to other homes. All three boys also spoke about [being] afraid of [M]other, who was

described as displaying very limited patience and engaging in repeated physical discipline and beatings of the boys. They described strangers coming in and out of the home, with [T.D.S.] mentioning waking up to a stranger lying in his bed. He also spoke about observing [M]other having sex with another woman. The boys reportedly had limited food in the home, often having to fix simple foods for themselves such as "Oodles of Noodles." They were also exposed to numerous evictions and a pattern of homelessness. The boys also spoke about a lack of structure and the absence of consistent discipline as well. It is also my understanding that [M]other neglected and failed to address the boys concerning mental health difficulties and behavior problems while they were in her care. The boys were also not sent to school by [M]other for virtually the entire school year prior to being placed. . . . According to [Maternal Aunt], the boys were even unfamiliar with how to take care of their basic hygiene needs, such as regular bathing, brushing their teeth.

Agency Exhibit 3 at 11 (emphasis added).

These accounts were echoed by the Children's providers, who additionally indicated that, during this time, the three oldest children tried to care for and comfort S.D.S., who was a baby and left in his crib in a dark room. This included changing his diaper, as it went unchanged, soothing him when he cried, and providing him milk, when able. *See* N.T., 11/2/23, at 35-41, 126-27. This resulted in parentification of the three oldest children and "pretty severe developmental delays" in S.D.S., including language delays. *See id.* at 40, 43, 53, 59, 126.

Furthermore, Ms. Wannamaker attested that the three oldest children remained fearful of Mother's continued behaviors. *See* N.T., 11/16/23, at 46-47. She stated, in part, "They are fearful of being abused. They are fearful of individuals that they don't know or are not comfortable with being around

- 18 -

them, that they would never have food or an appropriate or safe place to live." *Id.* at 46-47. She continued, "They are fearful of an environment that would consist of a meth lab, as [M.D.S.] specifically has that fear, given that when he was with [M]other, that he would be sent in an Uber by himself to deliver meth when it was dark out." *Id.* at 47.

Additionally, Dr. Mahady testified that B.S.S., who remained in Mother's care after the removal of the four oldest children, suffered "severe neglect." Following his removal, he tested positive for drugs and was found to be severely malnourished and diagnosed with failure to thrive. *See* N.T., 11/2/23, at 41-42.

Moreover, at regular permanency review hearings conducted from May 2022 through December 2022, Mother's compliance was characterized as none to minimal. *See* N.T., 11/16/23, at 24-26; Agency Exhibit 12. Ms. Wannamaker's testimony reveals that, despite the provision of "extensive" services, Mother failed to complete that which was required for reunification with the Children and to remedy the conditions that led to the Children's removal. *See* N.T., 11/16/23, at 7-13, 28, 35. Specifically, Mother had no stable housing or verifiable income. *See id.* at 12-13. She successfully completed curriculum-based parenting but did not complete any of the recommended services following a subsequent comprehensive parenting assessment. *See id.* at 9-10. Likewise, she did not successfully complete a mental health evaluation or offender's treatment. *See id.* at 9, 13. Perhaps

most importantly, although Mother initially completed inpatient substance abuse treatment, following completion of a substance abuse evaluation in March 2022 after relapse, she failed to complete the recommended treatment and was unsuccessfully discharged in May 2022. *See id.* at 7-8; Agency Exhibit 12. During this time period, Mother tested positive on multiple occasions for methamphetamines and amphetamines. She last participated in a drug screen on June 6, 2022. *See id.* at 8-9; *see also* Agency Exhibits 2 & 12. Of note, Ms. Wannamaker testified that when she met with Mother in January of 2023 and discussed Mother's uncompleted services and the potential for termination of parental rights, Mother was not receptive. *See* N.T., 11/16/23, at 50-51.

Based on the foregoing, given the blatant and egregious nature of Mother's actions and inactions, we without hesitation discern no abuse of discretion by the court in concluding that Mother's repeated and continued abuse, neglect, or refusal caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being.

Further, the conditions and causes of Mother's abuse, neglect, or refusal cannot or will not be remedied. Significantly, at the conclusion of the subject proceedings, the Agency had unsuccessfully afforded Mother services for almost three years and the four older children had formally been placed for almost two and a half years. This belies any suggestion of future compliance and progress. In fact, Ms. Wannamaker testified that, given the amount of

time that had elapsed, Mother was unlikely to remedy the conditions leading to the Children's removal within a reasonable period of time. *See* N.T., 11/16/23, at 36. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Having found sufficient grounds for termination pursuant to Section 2511(a)(2), we now turn to the orphans' court's finding that termination was proper under Section 2511(b). Specifically, Section 2511(b) affords "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always

- 21 -

consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

**K.T.**, 296 A.3d at 1105-06 (cleaned up).

Specifically, the child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." **Id.** at 1109. While our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child, the Court has explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." **Id.** "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010) (citing **In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008)).

Thus, the extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." **J.M.**, 991 A.2d at 324 (cleaned up). Rather, it is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." **M.E.**, 283 A.3d at 839 (cleaned up). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." **Id.** We will not disturb such an

assessment if the orphans' court's factual findings are supported by the record. *Id.*

In concluding that the Children's developmental, physical and emotional needs and welfare supported termination of Mother's parental rights, the orphans' court emphasized Mother's continued lack of progress. The court stated:

> The permanency goal for the [Children] since removal has always been for [them] to return to the parent. Mother has continued to demonstrate a lack of cooperation and communication with the [A]gency even when [M]other was showing some progress in this case, it was minimal and never consistent enough to prove that reunification would best serve the needs and welfare of the [Children]. Mother continues to struggle with the same issues which initially led to the removal 28 months ago. Mother has not made any notable progress since the case was opened despite having been offered various services from the [A]gency.
>
> . . .
>
> The [Children]'s needs are being addressed and the [Children are] reported to be making progress in areas where there was struggle at the time of removal. The court does not base its decision upon the environmental factors that are outside [parental] control but rather bases its decision on whether or not termination of parental rights … will best serve the developmental, physical, and emotional needs and welfare of the [Children].

Orphans' Court Opinion, 12/13/23, at 13-14 (unpaginated).

Upon review, the record substantiates that the Children do not share a necessary and beneficial relationship with Mother and instead share such a relationship with their foster parents. While we refer to the testimony of specific providers where necessary, we find the testimony of Ms.

Wannamaker, which is largely reflective of that of the Children's various providers, to be particularly helpful and instructive in this regard.

Mother's visitation with the Children, except for B.S.S., consisted of two in-person visits, which were part of Mother's parenting assessment, and was otherwise largely virtual. Her participation started strong but waned upon her return to Westmoreland County in January 2022. *See* N.T., 11/2/23, at 166-69, 179-82. Such visitation never progressed beyond supervised, and the court ultimately suspended all contact with Mother in May 2022.[14] *See* Agency Exhibit 12; *see also* N.T., 11/16/23, at 10-12, 45, 51, 74.

Significantly, Ms. Wannamaker testified that she observed the Children's fear and refusal during visitation with Mother, as follows:

> I have observed both visitation between the four [older] boys and [M]other as well as [B.S.S.] and [M]other. The [C]hildren have expressed great fear of [M]other and often during Zoom visitation when those were occurring, some of the boys would not want to participate or would refuse to get on the video to even speak with [M]other.

*Id.* at 11. She further described an in-person visit in April 2022 where [T.D.S.] "did not want to visit with [M]other and sat in a completely separate room with [Mr. Sibel] for quite some time." *Id.* Although Mr. Sibel reported Mother's behavior during visitation to be generally appropriate, he explained that there

---

[14] As noted *supra*, as best we can discern, the court did not suspend Mother's contact with B.S.S. until December 2022. *See* Agency Exhibit 12. Notwithstanding, her confirmation and participation in visitation with B.S.S. was limited. *See* N.T., 11/2/23, at 180, 182-83; N.T., 11/16/23, at 12.

was a lack of attention and interaction with the youngest two children. **See** N.T., 11/2/23, at 169-70, 177, 180-81.

Following suspension by the court, Ms. Wannamaker acknowledged that Mother attempted to violate the "no contact" order on several instances, which yielded negative reactions by the three oldest children. **See id.** at 33-34, 45, 75-76. Specifically, Ms. Wannamaker described, "[T.D.S. and M.J.-M.S.] wanted to fight [Mother]. They essentially grabbed golf clubs or bats or something along those lines, and they said like they will fight her. They don't want to—they don't want her to be coming here and causing fear for them." **Id.** at 75. Furthermore, if contact were resumed, Ms. Wannamaker expected "to see a lot of behavioral and emotional outbursts," given the trauma endured by the Children. **Id.** at 36.

Ms. Wannamaker testified that the three oldest children, who are able to articulate their desires, are fearful of Mother and do not want to live with her. **See id.** at 37, 39, 46. In fact, they do not want to see her. **See id.** at 75. Ms. Lavalle went so far as to state that there was no bond between them and Mother. **See** N.T., 11/2/23, at 18, 23. Ms. Wannamaker also explained that the two youngest children have no recollection of and no relationship with Mother. **See** N.T., 11/15/23, at 31, 37. Overall, she averred that the Children had suffered no negative impact as a result of their lack of contact with Mother. **See id.** at 45-46, 76-77.

Moreover, Ms. Wannamaker opined that Mother was not capable of meeting the Children's special needs, which were the result of the "severe emotional and behavioral trauma" they had suffered while in Mother's care. *See id.* at 32, 42-43, 83. Specifically, Ms. Wannamaker testified that the three oldest children had been diagnosed with PTSD, and T.D.S. had been diagnosed with autism. *See id*. at 32, 42.

In contrast, Ms. Wannamaker indicated that the Children are in pre-adoptive foster homes where they are doing well, and their needs are being met. *See id.* at 38-41. She stated, "All of the [C[hildren's needs and welfare are being met in their foster homes. … The foster parents make sure that they have a safe and appropriate home that's filled with love and nurturing." *Id.* at 39-40; *see also id.* at 37. Ms. Wannamaker continued, "From the adults, they have consistency and routines in their schedules.  The foster parents engage with the [C]hildren appropriately and ensure that they are involved in developmentally appropriate experiences. . . ." *Id.* at 40.

Additionally, Ms. Wannamaker observed that the Children "are so attached and bonded to their foster homes." *Id.* at 38. She stated, "The children that can voice their wants and needs consistently voice to me that they never want to leave [the] home, and they do not want to live with either parent. …" *Id.* at 37; *see id.* at 38-39. Despite acknowledging ongoing behavioral issues as a result of the trauma they experienced, Ms. Wannamaker observed that "[Maternal Aunt] is that safe space and safe person" for these

children. *Id.* at 41-42. Further, as to the two youngest children, Ms. Wannamaker indicated that their foster families are the only family they know. *See id.* at 39, 46. She acknowledged the "very, very strong connection" between S.D.S. and Maternal Aunt and stated, "[S.D.S.] looks at Maternal Aunt as his mother, and that is his safe space." *Id.* at 37, 45; *see also* N.T., 11/2/23, at 129. Similarly, "[B.D.S.] looks at his parents as the foster parents, and that is where his secure and stable attachment lies." *Id.* at 37; *see id.* at 41-45. Noting this secure attachment, as to B.S.S. and his foster mother, Ms. McKoy described, "When he sees her, he runs to her with his arms up. He's smiling. He just wants to be near her. …" N.T., 11/2/23, at 138.

While acknowledging the Children's ongoing treatment, Ms. Wannamaker testified that the Children were showing improvement. *See id.* at 41, 78-79. As to the three oldest children, she stated:

> The boys overall are doing well in their foster home. They also have severe mental health and trauma that they are—they continue to work through, and that is extensive, so we can't say how long it will take for that, but they do well. They work well with the providers.

> They all report to be safe and that they have their needs met. The children, again, do have mental health diagnoses and work with the contracted providers, and [Maternal Aunt] ensures all their needs are being met.

*Id.* at 41. Further, with respect to their overall progress, Ms. Wannamaker further testified, in part:

> All three children have much better grades, school staff, teachers, principals have reached out to us stating specifically [Maternal Aunt], what a wonderful job she does, all the effort she puts into these children.

. . .

> When these children came to [Maternal Aunt], they all did have some delays of some sort. They were not attending school in [M]other['s] and [F]ather's care.
>
> And since then, they just have made a ton of developmental and emotional improvements, being able to voice their needs, being able to begin to talk about their trauma and the fear and the things that these children have been put through and experienced with their parents.

*Id.* at 76-77.

Likewise, as to the youngest child, B.S.S., Ms. Wannamaker testified that he is "thriving." *Id.* at 41. She reported, "He demonstrates healthy and appropriate attachment to his foster parents and his foster siblings, and he responds to age[-]appropriate direction as needed. He also attends a child[-]care facility where he's able to engage with children his own age, appropriate activities, and begin to form other relationships." *Id.* at 41. Significantly, while B.S.S. displayed "almost no emotion" when he came into care, which Ms. Wannamaker explained was a "concern for [] neglect and maltreatment," he now "cries and reacts appropriately." *Id.* at 79. Despite the exhibition of some emotional dysregulation,[15] such as frustration, biting, and hitting, Ms. Wannamaker stated that this behavior is being addressed in therapy. *See id.*

_____

[15] In particular, Ms. Wannamaker testified,

> One of [B.S.S.]'s biggest triggers is a car seat. When he was in [M]other's care, he was stuck in a car seat for a long period of time.

*(Footnote Continued Next Page)*

Accordingly, Ms. Wannamaker opined that termination of Mother's parental rights would best serve the Children's needs and welfare and would not result in harm. ***See id.*** at 37-39, 46.

Based on the foregoing independent analysis of the orphans' court's termination of Mother's parental rights, we agree with Counsel that the appeals from the orders terminating Mother's parental rights pursuant to Section 2511(a)(2) and (b) are wholly frivolous and our review of the record does not reveal any overlooked non-frivolous issues.

For the foregoing reasons, we grant Counsel's petition to withdraw and we affirm the termination orders.

Counsel's petition to withdraw granted. Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 9/24/2024

---

So now when he's in a car seat and they have to travel more than five minutes, he is getting sick numerous times. He screams. He cries. He's inconsolable.

***Id.*** at 78.